USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  2/25/2026

# JOHN S. WALLENSTEIN
## Attorney at Law
### 1100 Franklin Avenue, Suite 305
### Garden City, New York 11530
### (516) 742-5600   fax (516) 742-5040
### JSWallensteinEsq@outlook.com

**BY ECF & EMAIL**
Hon. Nelson S. Román
United States District Judge, SDNY
300 Quarropas Street
White Plains, New York 10601

**The Government is directed to respond to Defendants' letter motion by March 2, 2026.  The Clerk of Court is respectfully directed to terminate the motion at ECF No. 237.**

**Dated: February 25, 2026**
**White Plains, NY**

SO ORDERED:

NELSON S. ROMÁN
United States District Judge

Re:     **United States v. Edwin Rodriguez-Genao**
        **23 CR 261 (NSR)**

Dear Judge Román;

We submit this letter, on behalf of Edwin Rodriguez-Genao and Juan Jose Genao-Adames, the two trial defendants,[1]  to respectfully  request that this Court limit the scope of the testimony of the government's proposed expert witness, Alfred Hernandez.  In a notice dated February 10, 2026, a copy of which is annexed hereto, the government informed the defense that they would call Alfred Hernandez to testify regarding the following:

(1) the use of slang and coded language by narcotics traffickers including the definitions of certain terms and phrases, and in particular the use of such terms in electronic or wire communications;

(2) the "tools of the trade" used to produce and distribute various types of narcotics, including mixtures and substances including cocaine, heroin, and fentanyl (such as what these substances are, and how they are produced and distributed);

(3) the appearance of various types of narcotics, including mixtures and substances containing cocaine;

(4) the pricing of narcotics (focusing on mixtures and substances containing cocaine, heroin and fentanyl) in the United States, including in the metro-New York City area;

(5) the use of cellular telephones and other communications devices by narcotics traffickers; and

---

[1] Undersigned counsel has consulted with James E. Neuman, counsel for Genao-Adames, who joins in this application.

MEMO ENDORSED

(6) the use of force and/or the threatened use of force in furtherance of drug trafficking activity." *Government Expert Disclosure, February 10, 2026.*

Additionally, the Government will seek to have the expert testify regarding his opinion that drug dealers often keep ledgers to keep track of their financial dealings, and that certain exhibits are consistent with such ledgers.

For the reasons noted herein, the defense moves to limit the testimony of the proffered expert. Specifically, testimony about the use of cellular telephones by drug traffickers, the use of ledgers to keep track of finances, and the use of force or threatened use of force in furtherance of drug trafficking activity, are subjects well within the common knowledge of jurors, and no expert is required.

## LEGAL BASIS FOR LIMITATION

Expert testimony may be barred if it would not assist the trier of fact and, instead, would simply amount to prejudicial and irrelevant bolstering, thereby violating Rules 702, 402 and 403 of the Federal Rules of Evidence. Rule 702 provides that an expert may testify if "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," so long as certain preconditions are met, including that the testimony "rests on a reliable foundation and is relevant to the task at hand." *Daubert v Merrel Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597 (1993); *see also, Kumho Tire Co. v Carmichael,* 526 U.S. 137, 150 (1999) (recognizing that it may be appropriate to evaluate different types of experts with different criteria for reliability). Expert testimony should be excluded if it is directed to lay matters which could be readily understood by the jury without the expert's help. *United States v Mulder,* 273 F.3rd 91, 101 (2nd Circuit, 2001); *United States v Castillo,* 924 F.2nd 1227, 1232 (2nd Circuit, 1991).

"[E]xpert testimony, like other forms of evidence, 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.'" *United States v Dukagjini*, 326 F.3rd 45, 51 (2nd Circuit, 2003) (referencing Fed. R. Evid. 403). Even when there is a legitimate reason for an expert to testify, the expert must be careful to limit his testimony to the scope of his

expertise and to conclusions based upon a reliable methodology, so as avoid juror confusion. 326 F.3rd at 54 and 59.

While the Second Circuit has "repeatedly affirmed that the operation of narcotics dealers are a proper subject for expert testimony", the Court has "carefully circumscribed the use of such testimony to occasions where the subject matter of the testimony is beyond the ken of the average juror." *United States v Castillo, supra.* Moreover, it is "impermissible" to allow the government to argue that the witness's version of events is  consistent with an expert's description of patterns of criminal conduct.  *United States v Cruz,* 981 F.2d 659, 663 (2nd Circuit, 1992) (expert testimony included opinions about "various routine acts in drug transactions – for example, the use of guns ***).

In *United States v Reddick,* 284 F.Supp.3rd 159 (D. Conn. 2018), the government proposed to introduce testimony on a variety of topics.  Though the Court admitted testimony about packaging, pricing, and terminology of drug trafficking, the Court made clear that expert testimony about the use of firearms was inappropriate:

> "For an expert to come in to state the obvious about guns and drug dealing going together not only exceeds the permissible limits of expert testimony but also comes with some unfair risk that the jury will conclude largely because of the expert's imprimatur that the gun at issue here must have had something to do with drug dealing. It is one thing for an expert to testify based on specialized knowledge about narcotics packaging materials and quite another for an expert to testify that drug dealers are commonly or usually gun criminals as well.

> "In any event, as the Second Circuit has cautioned, a jury may not *ipse dixit* conclude that solely because a drug dealer possesses a gun, then he necessarily possesses it to further his drug dealing. 'The government does not establish that a firearm was possessed in furtherance of drug trafficking merely by relying on the proposition that drug dealers generally use guns to protect themselves and their drugs, and thus that any time a gun is possessed by a drug dealer it is possessed in furtherance of his drug offenses.'" 284 F.Supp.3rd at 163

(citations omitted).

In addition, the Court stated that, even if such testimony was beyond the ken of the average juror, it would still be unfairly prejudicial under Rule 403. Numerous other courts have reached the same conclusion and barred the admission of so-called expert testimony about the use of firearms in narcotics trafficking.

### THE LAW APPLIED TO THE PROFFERED EXPERT TESTIMONY

In this case, the government posits that Mr. Hernandez will testify as follows, concerning firearms:

> Director Hernandez is expected to testify regarding the nexus between narcotics and firearms. He will testify that drug traffickers and dealers frequently possess or have access to firearms and ammunition to protect their narcotics for a number of reasons. First, drug dealers can carry firearms because of the wholesale and retail value of their narcotics. Second, one form of securing additional quantities of narcotics by drug dealers or drug-related organizations is to rob other drug dealers or organizations of their drugs or proceeds. As a result, drug dealers can carry firearms either in order to effectuate such robberies or as protection against such robberies. Third, individuals can carry firearms when buying or selling drugs to another person as protection if the transaction sours. Frequently one party in such an interaction may believe that the other is being dishonest about the method of payment or the quality of the narcotics, and both buyers and sellers carry firearms to either protect their investment or protect against such an escalation. Fourth, because narcotics often are sold in areas where multiple drug dealers or organizations are selling the same or similar product, territorial disputes sometimes arise between the different sellers. As protection, drug dealers can carry firearms in these competitive locations to protect against violence from their competitors.
>
> Drug dealers can secure firearms at locations - or with other individuals - from which the drug dealers or others they work with can access those firearms when needed, instead of carrying the firearms on their person. They do this to have access to the firearm without subjecting themselves to the risks of carrying the firearm, including the risk of being arrested.

There is absolutely nothing in that proffer which is beyond the knowledge of the average juror. In this digital age, most people have ready access to the internet and to other news sources, and the news feeds are unfortunately filled with stories of drug arrests and trials, and violent acts

committed by purported drug dealers. Unless one has been living under a rock in the desert for years, this information is not only readily available, but constantly broadcast. No expertise is needed to come to the conclusion sought, and to have a witness testify to essentially his observations over a long career in the guise of expertise invades the province of the jury and oversteps the boundaries of Rule 702.

The same principle applies to the issue of financial ledgers. Drug dealing is a business, albeit illegal. It should be obvious to anyone that someone who sells a product and collects money must keep some sort of record of the transactions. No expertise is required to draw that conclusion. Allowing the testimony, however, in the absence of a specific witness who can identify the documents the government seeks to introduce and decipher them, is highly prejudicial and speculative. Rule 403 thus precludes such testimony.

In 2026, almost everyone has a cell phone, and everyone knows how they work. There is no reason for an expert to testify that drug dealers use cell phones; every juror will have his or her own phone and struggle to avoid the temptation to look at it constantly during the trial. It is obvious to all that cell phones are part of the case, and fact witnesses will presumably testify regarding the use of phones by the defendants. The introduction of "expert" testimony is simply improper bolstering of fact witness testimony and violative of Rule 403. No expertise is required to explain the use of phones to a jury. The Court should not permit such testimony.

For all of the foregoing reasons, we respectfully request that the Court limit the testimony of the Government's proposed expert in accord herewith.

Respectfully yours,

*John S. Wallenstein*

JOHN S. WALLENSTEIN
VIRGINIA ALVAREZ
Attorneys for Edwin Rodriguez-Genao

-5-

**Disclosure as to Expert Witness Alfred Hernandez**
February 10, 2026

## I. Statement of Opinions, Bases, and Reasons

The following is a complete statement of all opinions that the Government will elicit from Alfred Hernandez, either in its case-in-chief or during its rebuttal to counter testimony that the defendant intends to offer, along with the bases and reasons for them:

The Government expects to call Alfred Hernandez, Director of Investigations with the New York City Department of Investigation and a Task Force Officer with the Drug Enforcement Administration. He is expected to testify, based on his training and experience, regarding (1) the use of slang and coded language by narcotics traffickers including the definitions of certain terms and phrases, and in particular the use of such terms in electronic or wire communications; (2) the "tools of the trade" used to produce and distribute various types of narcotics, including mixtures and substances including cocaine, heroin, and fentanyl (such as what these substances are, and how they are produced and distributed); (3) the appearance of various types of narcotics, including mixtures and substances containing cocaine; (4) the pricing of narcotics (focusing on mixtures and substances containing cocaine, heroin and fentanyl) in the United States, including in the metro-New York City area; (5) the use of cellular telephones and other communications devices by narcotics traffickers; and (6) the use of force and/or the threatened use of force in furtherance of drug trafficking activity.

Regarding the distribution weight of narcotics, Director Hernandez is expected to testify that he is familiar with the general manner by which cocaine, heroin, and fentanyl are distributed commercially. He will testify that cocaine can be sold either wholesale to other drug traffickers or dealers, or in retail quantities to end users.

Cocaine, or cocaine powder, is typically packaged for end users in plastic or Ziploc bags, jars, or similar containers. Possession of up to several grams of cocaine can be consistent with personal use absent additional indicators of distribution. For example, an "eight-ball" of cocaine typically consists of 3.5 grams of cocaine – possession of an "eight-ball" can also be consistent with distribution weight, in part because of the ability to convert the powder to crack cocaine before resale. Cocaine prices can fluctuate but one gram of cocaine generally sells in New York at a retail value of approximately $30.00. More than ten grams of cocaine is consistent with a resale quantity of cocaine rather than an amount for personal use.

Heroin is typically packaged for end users in glassine envelopes or sometimes plastic baggies. Individually packaged doses of heroin can likewise be referred to as "dime bags." An individual-use dose of heroin can vary, depending on the presences of cutting agents, adulterants, and similar factors-from a quarter of a grain of heroin up to one grain of heroin. One grain of heroin is equivalent to approximately 1/15 of a gram, and thus each gram of heroin contains approximately 15.43 "grains." One gram of heroin can generate approximately 30 to 40 individual-use dose amounts of heroin. An individual-use dime bag of heroin generally sells in New York at a retail value of approximately $10.00. Multiple grams of heroin are consistent with a resale quantity of heroin rather than an amount for personal use.

Fentanyl is typically sold to end users in pill form, frequently to mimic Oxycodone pills, and also in glassine envelopes. It may be sold as an additive to heroin or occasionally other substances such as cocaine. Fentanyl is typically 30 to 50 times more potent than heroin. An individual-use dose of fentanyl-laced heroin is a "dime bag" of heroin, typically sold in individual glassine envelopes. Given the potent effect of the fentanyl additive, an individual use dose of fentanyl-laced heroin will typically contain less heroin than an individual-use dose of heroin without fentanyl lacing. Thus, one gram of fentanyl-laced heroin can generate 40 or more individual-use dose amounts. An individual-use "dime bag" of fentanyl-laced heroin generally sells in New York at a retail value of approximately $10.

Director Hernandez will also testify about "polydrug traffickers," narcotics distributors who sell multiple varieties of narcotics. Possession of multiple varieties of narcotics, particularly distribution-quantities of multiple varieties, is consistent with narcotics distribution and not personal use. Polydrug trafficking can have certain advantages for the distributor over monodrug trafficking, including that the polydrug trafficker can serve as a "one-stop shop," *i.e.,* sell multiple types of narcotics to a particular end user who is interested in purchasing different types of drugs and also can serve as a single source of distribution across end users who purchase different types of drugs.

As relevant to images taken in this investigation, Director Hernandez is expected to testify as follows:

- The white powder visible in the plastic bag depicted in the image identified at control number USAO_DSR_GROUP_063850 / DSC_0158.jpg is consistent with the color of cocaine;
- The small plastic bags depicted in the image identified at control number USAO_DSR_GROUP_063850 / DSC_0161.jpg are the type of bags commonly used to package cocaine for retail distribution (and are frequently sold for $20 each);
- The scale depicted in the image identified at control number USAO_DSR_GROUP_063850 / DSC_0157.jpg is a scale commonly used to weigh drugs, including cocaine;
- Drug dealers often use trap compartments such as that visible in USAO_DSR_GROUP_063850 / DSC_0158.jpg and DSC_0159.jpg to hide their drugs and weaponry (such as ammunition of the type visible in USAO_DSR_GROUP_063850 / DSC_0159.jpg and an ammunition magazine of the type visible in USAO_DSR_GROUP_063850 / DSC_160.jpg);
- Drug dealers often keep ledgers to keep track of their financial dealings, including customers who owe them money (because drugs are at times provided to customers on the promise of future payment). The handwritten notes visible in USAO_DSR_GROUP_063850 / DSC_097.jpg are consistent with such ledgers.

Director Hernandez is expected to testify regarding the nexus between narcotics and firearms. He will testify that drug traffickers and dealers frequently possess or have access to firearms and ammunition to protect their narcotics for a number of reasons. First, drug dealers

can carry firearms because of the wholesale and retail value of their narcotics. Second, one form of securing additional quantities of narcotics by drug dealers or drug-related organizations is to rob other drug dealers or organizations of their drugs or proceeds. As a result, drug dealers can carry firearms either in order to effectuate such robberies or as protection against such robberies. Third, individuals can carry firearms when buying or selling drugs to another person as protection if the transaction sours. Frequently one party in such an interaction may believe that the other is being dishonest about the method of payment or the quality of the narcotics, and both buyers and sellers carry firearms to either protect their investment or protect against such an escalation. Fourth, because narcotics often are sold in areas where multiple drug dealers or organizations are selling the same or similar product, territorial disputes sometimes arise between the different sellers. As protection, drug dealers can carry firearms in these competitive locations to protect against violence from their competitors.

Drug dealers can secure firearms at locations – or with other individuals – from which the drug dealers or others they work with can access those firearms when needed, instead of carrying the firearms on their person. They do this to have access to the firearm without subjecting themselves to the risks of carrying the firearm, including the risk of being arrested.

Director Hernandez's testimony will be based on his training, education, and experience, including his almost four decades as a law enforcement officer primarily involved in investigating narcotics trafficking.

## II. Qualifications

Director Hernandez's qualifications, including all publications authored in the previous ten years, are contained in his *curriculum vitae*, attached hereto.

## III. List of Cases

A list of cases, to the best of Director Hernandez's recollection, in which, during the previous four years, he has testified as an expert at trial or by deposition is attached hereto.

Alfred Hernandez